## STATE v. TAYLOR.

1. EVIDENCE—CONTRADICTION.—DYING DECLARATIONS cannot be impeached by statements made by the deceased to another party at another time, not under oath and not under shadow of impending death.

2. IBID.—RES GESTAE.—Statements made by a decedent to a third party two hours after shooting, and 400 yards from scene of difficulty, are not part of *res gestae*.

3. PRACTICE—WITNESS.—ON CROSS-EXAMINATION of a witness, where all have been excluded, it is not error for counsel to give the witness an incorrect statement of what another witness on same side has sworn to, with a view to test the correctness of the memory or honesty of the witness.

4. EVIDENCE—DYING DECLARATIONS.—A statement made by a person a short while before death, but when he thought he was in no immediate danger of death, cannot be admitted as a dying declaration.

5. PRACTICE—STRIKING OUT INCOMPETENT ANSWER—WITNESS—JURIES AND JURY TRIALS.—When a witness answers an incompetent question while counsel is objecting, it is proper practice to refuse to strike out the answer, but jury must be told not to consider it. *Walker & Edwards* v. *Rayford,* 27 S. C., 178, and *Price* v. *R. R. Co.,* 38 S. C., 199, explained.

6. CHARGE.—Where a Judge instructs a jury that *corpus delicti* means that a "crime has been committed, and that the defendant at the bar committed it," he does not thereby take away from the jury all elements of self-defense, or accidental killing, when "crime" has been previously defined.

7. CORPUS DELICTI.—The term *corpus delicti* does not include the identity of the person charged with the criminal agency causing the death.

8. CHARGE—LEGAL PROVOCATION.—A hypothetical statement to the jury, that if the jury found certain facts, that such facts would not constitute sufficient legal provocation, is not a charge on the facts.

Before GARY, J., Newberry, July, 1899. Affirmed.

Indictment against Noah R. Taylor for murder. The charge is as follows, omitting the formal parts:

In this case there is little law to give you. There is no plea here of self-defense, so I need not burden you with telling you what the law of self-defense is, because it is not an issue in the case, and that being eliminated, the case is narrowed down mostly to a question of fact and not a question of law—the State charging, on the one hand, that the killing of this woman was wilful and malicious; the defendant contending, on the other hand, that it was accidental. So that is the problem that you must solve: whether it was wilfully and maliciously done or whether it was accidentally done, and in solving that question you can readily perceive that there can be but little law to aid you in solving that question of fact.

In all criminal cases the State is called upon to prove what is known among the profession as the *corpus delicti.* That, in plain English, means this: that a crime has been committed, and that the defendant at the bar committed it. If the State has made that appear to your satisfaction beyond a reasonable doubt, the State's case has been made out; if it has not, then the State's case has not been made out. So, in this inquiry, the first question that will address itself to you is this: Has a crime been committed; did the deceased come to a violent death, or did she die from some disease or from a natural cause? Now, I charge you that if she was in bad health and she was wilfully shot, and that shot hastened her death even but a minute, if it cut her existence off but for a minute, if it even hastened her death, the party inflicting the wound would be responsible for the consequences, and, to illustrate to you, a man may be in the throes of death, in the agony, it being a known fact that it is simply a question of a few minutes with him how long he would live, yet if some one else comes up and maliciously kills him or shortens his life but a minute, he is guilty of murder. So, your first

inquiry, then, as I said, will be: did she come to a violent death; did she receive a wound at the hand of the defendant that shortened her life or caused her death? If so, and that wound was inflicted wilfully and maliciously, then the party inflicting the wound is guilty of murder.

Now, murder is defined by the statute law of this State to be the unlawful killing of any person with malice aforethought, either expressed or implied, and manslaughter is the killing of another without malice aforethought, either expressed or implied, or upon sufficient legal provocation.

Now, Mr. Foreman and gentlemen of the jury, a great deal has been said about malice, and the rule is this: that where one person intentionally inflicts upon another a wound with a deadly weapon, or where one person shoots another with a pistol intentionally, the State, by proving that fact, makes out a case of murder, in the first instance; but if all the facts and circumstances attending the homicide are brought out, then you can readily see there is no need for any presumptions. You are to tell from the manner in which the homicide occurred whether or not it was done wilfully and maliciously, or whether accidentally. If accidentally, gentlemen, there is no crime in law, unless the party was criminally negligent, and there is no charge on the part of the State here of any criminal negligence. So, if you find from the facts that this wound inflicted upon this woman caused her death, and it was the result of an accident, the defendant would not be guilty, because accidents are matters over which human agencies have no control; accidents come unforeseen, they come unawares, and for that reason the law does not hold one responsible for an accident, unless, as I have said, he was criminally negligent in causing the accident; for instance, if he had not used proper care in the use of dangerous weapons—if he did, he would not be responsible; but, on the other hand, I charge you, if you should conclude from this evidence that the defendant at the bar wilfully and intentionally shot his wife because she had thrown up negroes to him, or because he had loaned

her mule, or because she had drunk whiskey, or was drink-
ing whiskey, if that was the reason that prompted him to
shoot her, and she died from the effects of that, I charge you
he is guilty of murder. That would not be a provocation
that the law would recognize or justify; it would not be an
excuse that he could plead successfully in a court of justice,
and for that reason, if he killed her for one or the other of
those reasons, the law would not excuse him, because he in
that instance would be rising superior to the law and higher
than the law; he would be taking the life of his fellow-man
upon such provocation or such excuse as the law would not
recognize.

Now, I need not dwell upon the question of malice. If
he shot her intentionally, from the effects of which she died,
and he did not shoot her in sudden heat and passion and
upon such provocation as the law would excuse him upon,
that is malice. Malice is either inferred from the facts and
circumstances attending the homicide or it is expressed.
You would say malice is expressed, where a party goes and
makes preparation, loads a gun and goes in pursuit of
another, or lies in wait for him and shoots him—under those
circumstances, that is expressed malice; but where one kills
another upon no provocation or upon very slight provoca-
tion, the law implies that it was maliciously done, and would
hold him guilty of murder. Now, if he killed her in sudden
heat and passion, and was prompted by a provocation such
as the law would recognize, then he would be guilty of man-
slaughter. Now, what is a legal provocation or such a pro-
vocation as the law would recognize? I can better illus-
trate to you what a legal provocation is by illustrating to you
what is not a legal provocation. If one man kills another
because he insults him, that is not a legal provocation, and it
would not reduce the killing from murder to manslaughter.
Or if he kill by reason of some threat that has been used,
that would not be a sufficient legal provocation, and would
not reduce the killing from murder to manslaughter. So,
then, to make it manslaughter, it must have been in sudden

heat and passion and upon sufficient legal provocation. There is a very late decision in our own State that, I think, expresses it very tersely, and if you will pardon me I will read you just a short extract from it: "Besides that, when one man wilfully inflicts with a deadly weapon a fatal wound upon another, the law implies malice and holds him responsible, and if the circumstances of the case show that it was done while the parties were angry with each other, then the State, by proving that, does prove malice, unless the circumstances show it was a case of manslaughter, by the blow having been inflicted in sudden heat and passion, after sufficient legal provocation, or in self-defense." If it was inflicted in sudden heat and passion upon sufficient legal provocation, then it would be manslaughter; but if the provocation was not sufficient, or it was not in sudden heat and passion, then it would be murder.* * *

From verdict of guilty, with recommendation to mercy, and sentence thereunder, defendant appeals.

*Messrs. O. L. Schumpert* and *Hunt & Hunt,* for appellant, cite: *It was error to exclude the declarations of deceased before and after dying declarations in contradiction thereof:* 164 U. S., 698; 156 U. S., 257. *Incompetent testimony should have been stricken from record upon motion:* 27 S. C., 178; 38 S. C., 199. *As to charge:* 47 S. C., 488; 49 S. C., 550.

*Messrs. Solicitor Sease* and *Johnstone & Welsh,* contra, cite: *Exceptions too general:* 30 S. C., 170; 43 S. C., 99; 51 S. C., 56. *Statements not part of res gestae:* 13 S. C., 463; 47 S. C., 9. *Proper practice in ruling out incompetent testimony:* 53 S. C., 80. *Conduct of trial as to latitude of cross-examination is within discretion of presiding Judge:* 16 S. C., 378; 55 S. C., 44. *As to dying declarations:* 35 S. C., 298; 49 S. C., 554. *Objection not made on Circuit cannot be made here:* 53 S. C., 268. *As to charge:* 49 S. C., 294, 548.

January 2, 1900.   The opinion of the Court was delivered by

MR. CHIEF JUSTICE MCIVER.   Under an indictment for the murder of Mary E. Taylor (the wife of the prisoner), the defendant was found guilty, with a recommendation to the mercy of the Court, and sentenced to imprisonment for life in the State penitentiary, at hard labor.   From this judgment defendant gave due notice of appeal, based upon the several exceptions which will be hereinafter stated and considered. The undisputed testimony, which is set out in the "Case," tends to show that on Sunday morning, the 5th day of March, 1899, the deceased, while in her house with her husband, the appellant, received the fatal wound from a pistol shot, the ball entering under her left eye, ranging downwards and lodging in the back of her neck.   Immediately after she was shot, the deceased went over to the house of Zeke Taylor, her father-in-law—a distance of some three or four hundred yards—and from there she seems to have been taken to the house of W. C. Dominick.   While there the pistol ball was extracted from her neck, and in a few days afterwards she was removed to the house of her father, Henry Dominick, where she remained until she died, on the 23d of March, 1899, very early in the morning.   While at the house of W. C. Dominick, on the 8th of March, 1899, she signed a statement in writing, which had been prepared at her dictation by Dr. Wheeler, one of her attending physicians, which statement reads as follows: "March 8th, 1899. I, Mary E. Taylor, depose and make this my last dying statement, to wit: That on the 5th day of March, 1899, between 9 o'clock A. M. and 10 A. M., Noah R. Taylor did maliciously and wilfully shoot me, without any cause whatever.   I did not attempt to shoot him with shotgun or pistol, nor hurt him in any way.   He shot me twice—the first shot struck me.   I then caught the pistol and knocked it up, when it was discharged, missing me.   He then turned the pistol loose, and I ran out of the house and threw the pistol under the house, fearing he might take the pistol away from

me and shoot me again.  I ran, fearing he might kill me in
any way he could.  He was not hurt or injured in any way
when he shot me nor when I left.  This statement is the
truth.  (Signed) Mary E. Taylor.  Witness: J. S. Whee-
ler, M. D., W. C. Dominick, Geo. Y. Hunter, M. D."  This
written statement seems to have been offered in evidence as
a dying declaration, and was received without objection.

The exceptions will now be stated and considered sepa-
rately.  "1. Because the presiding Judge erred in ruling
that Jacob Enlow, a witness offered in behalf of the defend-
ant, could not testify as to what Mrs. Mary E. Taylor, the
deceased, said to him in reference to the shooting, on the
morning of the shooting and within an hour or two after
she was shot."  Counsel for the State take the position that
this exception is too general to require its consideration by
the Court.  Inasmuch as no specific error is pointed
out in the exception, the position seems to be well
taken.  The following extracts from the "Case" will
show what occurred in the Court below when the testimony
referred to in the exception was offered: "Did Mrs. Taylor
say anything to you that morning about this difficulty?  A.
Yes, sir.  Q. What did she say?  Objected to by Solicitor
as hearsay.  By the Court: How long after the shooting
was it?  A. From what I understood?  I didn't hear the
shooting.  By the Court: You have an idea when the shoot-
ing took place?  A. Yes, sir.  By the Court: We want
your idea about how long the conversation took place after
the shooting?  A. I would say a couple of hours—I can't
say exactly; I would say a couple of hours, to make a guess
at it.  By the Court: I think it is too remote.  Q. How
many conversations did you have with her that day?  A.
About two.  Q. When was the first one?  A. It might
have been about 11 o'clock, or may be a little later than
that; I didn't look.  Q. When did you have the next one?
A. In the afternoon.  Mr. Hunt (one of the counsel for the
defense) : We think the first is near enough after the shoot-
ing for him to state what was said.  By the Court: No, as I

understand *res gestae,* it must be so intimately connected
with the occurrence as to become a part of it." After this,
the witness was asked some other questions not pertinent to
the points under consideration, when the following oc-
curred: "Q. You say she told you how the difficulty
occurred? A. Yes, sir. Q. That you say was about 11
o'clock in the morning? By the Court: Where was she
when she had this conversation? A. At Zeke Taylor's.
By the Court: That was how far from the scene of the
tragedy where she was shot? A. About 400 yards. By
the Court: And she was at his house? A. Yes, through the
footpath about 400 yards. Q. How did she tell you that
difficulty occurred? Objection by Solicitor Sease. Hear-
say. By the Court: I sustain the objection, it not being a
part of the *res gestae,* and it not being shown that she was in
*extremis* when she made the statement." The witness was
then asked: "Q. In that conversation, did she say anything
to you about dying? A. No, sir." After which no fur-
ther questions were asked as to the conversation he said
he had with the deceased, as to the origin of the difficulty.
From this statement it is very manifest that the only rulings
which the Circuit Judge made, or was called on to make,
was whether the conversation between the witness and the
deceased was a part of the *res gestae,* and whether the state-
ments she made were admissible as dying declarations.
The Circuit Judge neither made, nor was he called upon to
make, any ruling as to whether the testimony ruled out was
competent, as contrary to the statements she had made in
the written statement taken down by Dr. Wheeler, herein-
above referred to, and offered as her dying declarations.
This question, so far as we can perceive from the record
before us, was, for the first time, made in the argument here,
and the Circuit Judge has never made, nor been called upon
to make, any ruling as to such question. Under these cir-
cumstances, it is more than doubtful whether this Court
should now consider whether the Circuit Judge has erred
in making a ruling which it does not appear that he ever

made, or was asked to make.  But *ex gratia* we will not de-
cline to consider the question in a case involving such grave
consequences as this.   Whether in a case of murder it is
competent for the defense to offer testimony impeaching the
testimony of the deceased, given through his dying declara-
tions, by offering testimony tending to show that the de-
ceased has made other statements in conflict with those con-
tained in his dying declarations, is a question upon which
there is some conflict of authority elsewhere, and, so far as
we are informed, has been presented in only one case in this
State—*State* v. *Bannister,* 35 S. C., 290—where such testi-
mony was rejected and, this Court held, properly rejected.
It is true, however, that in that case the question here pre-
sented does not appear to have been distinctly considered.
In the case of *Wroe* v. *State,* 20 Ohio St., 460, the question
was distinctly decided in accordance with the view which we
have adopted, that such testimony is incompetent.   In that
case, the Court, in speaking of such testimony, used this lan-
guage : "To admit it would, to some extent, afford a substi-
tute to the defendant for the loss of cross-examination, but
it would deprive the deceased and the State of all opportu-
nity for explanation."   And in another case, *Craft* v. *Com-
monwealth,* 81 Ky., 250, which was not a case of an attempt
to impeach the dying declarations of the deceased, but was
an attempt to impeach the testimony of a witness who had
testified at a former trial of the case and had since died, by
showing that such witness after the former trial had stated
that his testimony given at the former trial was false, when
the Court held that such testimony was not competent, say-
ing that the rule is put upon the ground that if the impeach-
ing statements were admitted, there would be a strong
temptation to the fabrication of testimony by which import-
ant and true evidence might be destroyed.   Counsel for
appellant has cited the case of *Carver* v. *United States,* 164
U. S., 694, in support of his contention that the testimony in
question was competent for the purpose of contradicting and
impeaching the statements made by the deceased in her

dying declarations, and that case does so hold. But it seems to us that, *in principle,* that case is irreconcilable with the previous case of *Mattox* v. *United States,* 156 U. S., 237, which, while not a case of an attempt to impeach dying declarations, the whole subject was fully and elaborately considered—much more so than in the case of Carver. In both of these cases the Court was divided, and we are not prepared to accept either as binding authority upon us, in a case of this character, where no Federal question is involved. On the contrary, it seems to us that the conclusion reached by the Ohio Court, in *Wroe* v. *State, supra,* is more in accordance with reason than the contrary conclusion. To hold that it is competent to impeach the dying declarations of a deceased person by testimony tending to show that she had made statements in conflict with those contained in her dying declarations, not under the sanction of an oath nor under the shadow of impending death, would tend not only to afford a strong temptation to the fabrication of false testimony to save the life of the accused when death had rendered it impossible to rebut or explain such statements, but would also tend to absolutely destroy the efficiency of dying declarations as evidence. We do not think, therefore, that such testimony is competent.

Nor do we think that such testimony was admissible as a part of the *res gestae.* The rule as stated in 21 Am. & Eng. Ency. of Law, at pp. 99-100 and 101, is stated as follows: "If the statements sought to be proved are not contemporaneous with the act, or if they amount to no more than a mere narrative of a past occurrence, or of an isolated conversation held, or an isolated act done at a later period, they are not admissible." Now the statements alleged to have been made by the deceased to the witness, Jacob Enlow, were made at least two hours after the deceased was shot, and after she had fled from her own house where she was shot, and had taken refuge in a neighbor's house, and were, manifestly, nothing more than a mere narrative of a past occurrence. It is clear, therefore, that

24—56

the Circuit Judge was entirely right in ruling that such statements were not competent as a part of the *res gestae.* It is equally clear that they were not competent as dying declarations, for there was no testimony that, at the time such alleged statements were made, either that death was imminent or that the deceased had lost hope of recovery. Indeed, it was not argued here that these statements were admissible either as a part of the *res gestae* or as dying declarations. In any view that may be taken of the first exception, it cannot be sustained, and must, therefore, be overruled.

The second exception having been very properly abandoned upon the argument here, need not be either stated or considered.

The third exception is as follows: "Because the presiding Judge erred in not allowing Mrs. Edith Taylor, a witness for the defendant, to testify to the statements made to her by Mary E. Taylor in reference to the shooting." This exception is open to the same objection, and presents practically the same questions as have been already considered in discussing the first exception; and must, for the same reasons, be overruled.

The fourth exception reads as follows: "Because the presiding Judge erred in holding and deciding that counsel for the State could repeat to a witness the testimony of a former witness, when a rule had been issued, at the beginning of• the trial, that all witnesses be excluded from the court room." The following extracts from the "Case" will enable us to better understand the points made by this exception. When Mrs. Edith Taylor, the wife of Zeke Taylor, and the mother of the defendant, was on the stand as a witness for the defense, the following occurred in the course of the cross-examination by counsel for the State: "Your husband says—Mr. Hunt (one of the counsel for the defense) : I object; the witnesses have been excluded, and the object is not to let one witness know what another one swore. By the Court: It is the cross-ex-

amination. He can test the verity of the statement of the other witness. Mr. Hunt: We insist that if the statement is to be made to the witness of what another witness said, the witness' statement be taken from the record. By the Court: He can manufacture, as it were, a statement made by a witness to test this witness. The witness need not have made the statement he is asking this witness about. He can conceive of that in his own mind to test this witness. Mr. Hunt: And state what another witness has said? By the Court: I think so, in the cross-examination. Exception by Mr. Hunt." Counsel for the State then varied the form of his question, and instead of stating "your husband says," and put the question in a hypothetical form, "if your husband says * * * is he telling the turth or a falsehood?" So that in the case of this witness, counsel for the State did not state to her what her husband had testified, but simply asked her if her husband had said so and so, whether it was false. But when Mrs. Nancy Taylor was on the stand *as a witness for the State,* in reply, counsel for the State was permitted to state to her what Zeke Taylor had testified, in regard to what the deceased said to him while in the room with her, with the door locked and no one else present, and asked whether such testimony was true; to which she replied that it was not true—that she was in the room with Zeke Taylor all the time while the door was locked, and that the deceased made no such statement as that testified to by Zeke Taylor. As we understand it, the main object of the rule permitting the exclusion of witnesses from the Court room while the testimony is being taken, is to prevent the opportunity and the temptation for the witnesses *on the same side* to conform their own testimony to that of those who have preceded them upon the stand; but this, of course, would not apply to witnesses *on the other side,* who are oftentimes offered for the express purpose of contradicting the testimony of a witness on the other side; and this could not be done effectually unless the testimony of the witness pro-

posed to be contradicted could be stated to the witness who is offered for such contradiction. Besides, the main object of a cross-examination being to test the accuracy and veracity of the witness undergoing such examination, we see no reason why, *on the cross-examination,* witnesses may not be told, either correctly or incorrectly, what another witness *on the same side* has testified to, with a view to test the correctness of the memory or the honesty of the witness. While, therefore, we can readily perceive that it would tend to defeat the object of excluding witnesses from the Court room, if the counsel who offers a witness should be permitted to state what a witness previously examined *on the same side* had testified, we do not see that any evil result would follow from allowing the opposing counsel to state to a witness what a witness previously examined on the same side had said, but on the contrary, would tend to elicit the truth—the object of all testimony. The fourth exception must, therefore, be overruled.

The fifth exception reads as follows: "Because the presiding Judge erred in not allowing Mrs. Nancy Taylor, a witness for the defendant, to testify as to a statement made to her by Mrs. Mary E. Taylor, deceased, as to how the difficulty happened between her and her husband, when it already appeared in evidence that this statement was made *in articulo mortis.*" This exception is not mentioned in the printed argument for the appellant, but it was alluded to in the oral argument, and, therefore, we are not at liberty to regard it as abandoned, and we will proceed to consider it. The error imputed in this exception to the Circuit Judge is in holding that the statement of the deceased, which it was proposed to prove by Mrs. Nancy Taylor, was not made *in articulo mortis,* and, therefore, not admissible as a dying declaration. The rule on the subject of dying declarations was laid down by this Court in *The State* v. *Johnson,* 26 S. C., at page 153, and reaffirmed in *The State* v. *Bannister, supra,* as follows: "1st. That death must be imminent at the

time, the declarations in question are made. 2d. That the declarant must be so fully aware of this as to be without any hope of life (citing the cases). And 3d. That the 'subject of the charge' must be the death of the declarant, and the circumstances of the death must be the 'subject of the declarations.'" Now, while the first and third of these requirements were present, yet the second, and most important of all, was not only absent, but the testimony abundantly shows did not exist. The conversation in which the statements in question were alleged to have been made occurred on the 22d of March, 1899, the day before the deceased died, and the undisputed testimony is that on the evening of that very day the attending physician had told the deceased that she was doing so well that it would not be necessary to continue visiting her regularly—"only to come back every now and then to see how the wound we made was getting on"—referring to the incision which the doctors had made for the purpose of extracting the bullet. And on that very day the deceased was sitting up by the fire, and went to the table for her meals. There was every reason, therefore, for the deceased to believe that she was recovering, and none whatever that she supposed she was in a dying condition, or that she had lost all hope of recovery, when she made the alleged statements to Mrs. Nancy Taylor; or, to use the language of this exception, that she was then *in articulo mortis.* So that it is clear that the second and most important requirement of the rule was wanting, and hence there was no error in not allowing Mrs. Nancy Taylor to testify as to the statements made to her by the deceased on the 22d of March, 1899, as dying declarations. It is true, that on the 8th of March, 1899, when the statements made by the deceased, as her dying declarations, were reduced to writing by Dr. Wheeler and signed by the deceased, that both she and her attending physicians supposed (erroneously, as the event proved), that she was then in a dying condition; but after that, and after the ball had been extracted, she manifestly began to improve—so much so as to

warrant her removal to the house of her father, Henry Dominick, a distance of some five or six miles, where she appeared to continue to improve—so much so, as to be up sitting at the fire and going to her meals at the dinner table. It is also true that she died very early the next morning— about six o'clock—but, in the opinion of her attending physicians, as testified by them, the immediate cause of her death was the sloughing of the carotid artery, opening a hole in it, caused by the passage of the bullet so near the artery as to injure the coats of the artery, through which her life-blood speedily poured out; and while in this dying condition, as she herself said, she again declared that the statements contained in the writing prepared by Dr. Wheeler, at her dictation, on the 8th of March, were all true, and in a few minutes after she was dead.   So that it is quite clear that this statement met all the requirements of the rule with respect to dying declarations.   *State* v. *McEvoy, 9* S. C., 208.   But any statement which she may have made the day before, when she was not in a dying condition, and when she had no reason to so suppose, would not be competent as a dying declaration.   Exception five must, therefore, be overruled.

The sixth exception is as follows: "Because the presiding Judge erred in refusing to strike from the record the testimony of George Dominick, after ruling that his testimony was incompetent."   When this witness was called in reply, he was asked what was the condition of the hair of the deceased when she came to Zeke Taylor's on the morning she was shot, and though objection seems to have been made, he answered: "Her hair was down."   Whereupon counsel for defense moved to strike out the testimony as not in reply and, therefore, incompetent. The Court ruled that the testimony was not relevant and not in reply.   Counsel for defense again moved "to strike out the answer of the defendant(?) (no doubt a misprint for witness)—because he answered while I was objecting.   By the Court: The jury have heard it, and I can only tell them

that it is not competent evidence. I have no right, as I conceive it, to change the record. I can only put the ruling on record, and the stenographer's notes ought to show what the answer was and what my ruling was. I do not think it is proper practice to erase a record; in other words, the record ought to be a photograph of the trial." This exception, as it seems to us, raises a question of form rather than of substance. When the jury, who had heard the objectionable answer, were immediately told that it was incompetent, that subserved the same purpose, equally as well, if not better, as if the stenographer had been directed by the Court to strike out the answer. The cases of *Walker & Edwards* v. *Rayford, 27* S. C., 178, and *Price* v. *Railroad Co.,* 38 S. C., 199, cited by counsel for the defense, do not hold that it would be error to pursue the course adopted by the Circuit Judge in the present case; but they simply hold that, where a witness goes beyond the scope of the question, and in his answer makes statements which are incompetent, the proper practice is to move to strike out so much of the answer as is incompetent. This may be the proper practice in such a case, with this explanation that the words "strike out" are not to be understood, in their literal sense, as meaning an *erasure* of the incompetent testimony, but that the stenographer, leaving the testimony as he had taken it down, shall state that the incompetent testimony was ordered by the Court to be stricken out as incompetent; so that, if an appeal be taken, this Court may have before it a precise transcript of what occurred in the trial below. But, as we have said, this is more a matter of form than substance, and even if the Circuit Judge was technically in error, it was entirely harmless. We, like the Circuit Judge, are unable to perceive how the condition of the hair of the deceased was in when she reached the house of Zeke Taylor immediately after she was shot could have any relevancy to any issue in the case. It was conceded by both sides that she had just been engaged in a struggle with her husband over the pistol, and it was quite natural that her hair should have been down,

whatever may have been the true version of the struggle. Exception six must, therefore, be overruled.

Exception seven reads as follows: "Because the presiding Judge erred in charging the jury: 'In all criminal cases the State is called upon to prove what is known among the profession as the *corpus delicti.* That, in plain English, means this: that a crime has been committed, and that the defendant at the bar committed it. If the State has made that appear to your satisfaction, beyond a reasonable doubt, the State's case has been made out; if it has not, then the State's case has not been made out.' " What error is intended to be imputed to the Circuit Judge by this exception, it is impossible to discover from the language used in the exception. We learn, however, from the argument here that the error imputed is that the Judge, "by this charge, excluded from the consideration of the jury all the elements of self-defense or accidental killing." We do not think the charge open to any such imputation. If, as the jury were told, they were satisfied beyond a reasonable doubt that "*a crime* has been committed," then that necessarily involved the conclusion that the killing was not in self-defense, nor the result of mere accident, unattended with criminal fault on the part of the accused, for neither of those modes of killing would be "*a crime*," as the jury were instructed in other portions of the charge, a copy of which should be incorporated by the Reporter in his report of the case. We may add, however, to avoid any misapprehension, that while the definition of the phrase *corpus delicti* may not be technically accurate, inasmuch as it does not embrace the identity of the person charged with the criminal agency causing the death (3 Greenlf. on Ev., sec. 30, 7 Am. & Eng. Ency. of Law, 2d edit., p. 861, *et seq.*; *State* v. *Martin*, 47 S. C., 67), yet such inaccuracy is not claimed to affect, and could not possibly affect, the merits of this case. The seventh exception is, therefore, overruled.

The eighth and last exception reads as follows: "Because

the presiding Judge erred in charging as follows: 'I charge you, if you should conclude from this evidence that the defendant at the bar wilfully and intentionally shot his wife because she had thrown up negroes to him, or because he had loaned her mule, or because she had drunk whiskey, or was drinking whiskey, if that was the reason that prompted him to shoot her, and she died from the effects of that, I charge you he is guilty of murder.' " Here, again, it would be very difficult, if not impossible, to discover from the terms of this exception what was the error intended to be imputed. But we learn from the argument here that the error assigned is that, in so charging, the Circuit Judge violated that provision of the Constitution which forbids a Judge from charging on the facts. We do not see that, in the language of the extract from the charge upon which this exception is based, that the Judge in any way whatsoever intimated any opinion as to the facts proved. He does not even state that any fact had been testified to by a witness on either side. He simply stated, hypothetically, that if the jury found certain facts, that such facts would not constitute sufficient legal provocation. The extract is taken from that portion of the charge in which the Judge was instructing the jury as to what would constitute sufficient legal provocation to reduce a killing from murder to manslaughter, and, in that connection, he very naturally explained to the jury what would not constitute such provocation. Besides, there was no contention on the part of the defendant that the killing was done under sufficient provocation, and such a contention would have been utterly inconsistent with the defense upon which he relied—that the killing was the result of pure accident, unaccompanied with any fault on his part. The eighth exception must, therefore, be overruled.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.

*Mr. Justice Jones concurs in result.*