### STATE v. PITTMAN, *ET AL.*

#### (134 S. E., 514)

1. CRIMINAL LAW.—In prosecution for murder, denial of new trial for after-discovered evidence, which tended only to impeach State's witness or corroborate testimony in support of plea of alibi, *held* not error.

---

NOTE.—Impeaching or contradictory evidence not grounds for new trial, see 20 R. C. L., 294; 3 R. C. L., Supp., 1052; 4 R. C. L., Supp., 1352; 5 R. C. L., Supp., 1096.

Reasons for exclusion of confessions not voluntary made, see notes in 18 L. R. A. (N. S.), 771; 50 L. R. A. (N. S.), 1077; 1 R. C. L., pp. 550 *et seq.;* 1 R. C. L., Supp., pp. 197 *et seq.;* 4 R. C. L., Supp., p. 41; 5 R. C. L., Supp., p. 31.

2. CRIMINAL LAW.—Newly discovered evidence, which merely impeaches or contradicts testimony of witness, affords no ground for new trial.

3. CRIMINAL LAW.—When after-discovered evidence makes it clear that witness was mistaken in giving only or controlling testimony to material fact, or that essential testimony was founded on circumstances clearly falsified, new trial should be granted.

4. CRIMINAL LAW.—Newly discovered evidence, though in sense cumulative, may throw such light on vital issue or be of such compelling force as clearly to require new trial.

5. CRIMINAL LAW—STATEMENT BY DEFENDANT AS TO IDENTITY OF ONE WITH HIM AT STILL HELD NOT CONFESSION, AND NOT IMPROPERLY ADMITTED, THOUGH MADE UNDER DURESS.—In prosecution for murder, admission of statement made under duress by one defendant as to identity of person with him at still, and that such person did actual killing, *held* not error; such statement not being confession in form or tenor.

6. CRIMINAL LAW.—"Confession," in legal sense, is restricted to acknowledgment of guilt, and does not apply to mere statement of fact from which guilt may be inferred.

7. CRIMINAL LAW.—Generally, all that one has said which is relevant to questions involved is admissible in evidence against him.

8. CRIMINAL LAW.—In prosecution for murder, admission of statement by defendant, in custody, "I guess I will have to go to the electric chair," even if treated as confession, *held* not made under duress, and properly admitted.

9. CRIMINAL LAW.—In prosecution for murder committed at illicit distillery, evidence of other operations conducted in particular manner by one defendant *held* admissible to prove motive and identity of that defendant.

10. CRIMINAL LAW.—Generally, evidence of other crimes is competent when it tends to establish motive, intent, absence of mistake, or accident, a common scheme, or identity of person charged.

11. CRIMINAL LAW—OPINION AS TO IDENTITY OF TRACK NEAR SCENE OF HOMICIDE HELD ADMISSIBLE.—In prosecution for murder committed at illicit distillery, permitting witness, who asserted familiarity with tracks of one defendant through previous experience in tracking him as illicit distiller, to testify that in his opinion a track found near the still two days after homicide was the track of that defendant, *held* not error.

12. CRIMINAL LAW.—Generally, a witness who undertakes to testify to resemblance or identity should be confined to statement of facts tending to establish identity, or to statement of inference on basis of facts detailed.

13. CRIMINAL LAW—HOMICIDE.—In prosecution for murder, failure of court to charge on law of self-defense *held* not error, there being no request for such charge or evidence to support it.

14. CRIMINAL LAW.—In prosecution of two defendants, one only of whom interposed defense of alibi, court's inadvertent use of word "defendants," instead of "defendant," in charging on defense of alibi, *held* not prejudicial.

15. HOMICIDE—IN PROSECUTION FOR MURDER COMMITTED AT ILLICIT DISTILLERY, INSTRUCTION AS TO GUILT OF TWO PERSONS ENTERING ON "UNLAWFUL ENTERPRISE" HELD NOT PREJUDICIAL.—In prosecution of two defendants for murder committed at illicit distillery, instruction "if two or more persons were engaged on an unlawful enterprise to do an unlawful act. and that act is done. * * * one is as guilty as the other," *held* not technically erroneous or prejudicial, whether words "unlawful act" related to the murder or the manufacture of illicit liquor.

16. HOMICIDE.—Evidnce held to sustain conviction for murder.

ON PETITION FOR REHEARING

17. HOMICIDE—ADMISSION OF EVIDENCE THAT, AS RESULT OF IDENTIFICATION OF HATS FOUND AT LOOKOUT STATION, DECEASED AND WITNESS EXPECTED TO FIND ONE OF DEFENDANTS AND ANOTHER NAMED PERSON AT STILL, HELD NOT ERROR.—In prosecution for murder committed at illicit distillery, where Court refused to admit evidence that deceased on way to still had identified hats found at lookout station, a quarter of a mile from it, as belonging to defendants, *held* admission of evidence that such hats were identified as belonging to some one, and that, as result of such identification, witness and deceased were expecting to find one of the defendants and another named person at still, was not error.

18. CRIMINAL LAW—WHERE FALSE STATEMENTS BY DEFENDANT WERE CONCEDED, CHARGE THAT FALSE OR CONTRADICTORY EXPLANATIONS, WITH OTHER CIRCUMSTANCES, MIGHT WARRANT INFERENCE OF GUILT, HELD NOT PREJUDICIAL.—In prosecution for murder committed at illicit distillery, where it was admitted that, following homicide, one defendant had made false statement as to identity of person who was with him at still, *held,* instruction that, if "either of the defendants has made false or contradictory explanations of incriminating circumstances, such fact, in connection with other circumstances, may be sufficient to warrant the inference of his guilt," was not error as charged on the facts, or as unduly stressing one of State's contentions.

19. CRIMINAL LAW.—Court may properly suggest to jury that, if accused has uttered false exculpatory statements, it may, but need not necessarily, infer his guilt therefrom.

Before MAULDIN, J., Greenville, May, 1924. Affirmed.

Alex Pittman and another were convicted of murder and they appeal.

*Messrs. Bowan & Bryson,* for appellants, cite: *Affidavit that witness for prosecution made statements out of Court contradicting his testimony at trial deemed after-discovered evidence and ground for new trial:* 104 S. C., 353; 89 S. E., 153; 106 S. C., 437. *Whether statement made under duress or not is question for jury:* 106 S. E., 575; 99 S. C., 504; 83 S. E., 971. *Burden on State to show confession voluntary:* 99 S. C., 504; 83 S. E., 971; 13 S. C., 395. *Defendant cannot be forced to testify against himself:* Const. 1895, Art. I, Sec., 17; 124 S. E., 81. *Testimony as to other liquor transactions of defendants erroneously admitted:* 128 S. E., 709; 123 S. E., 260; 104 S. C., 353; 89 S. E., 154; 98 S. C., 114; 82 S. E., 278; 79 S. C., 187; 1 Wharton on Crim. Ev., 10th Ed., 217. *Where conversations inadmissible as hearsay, evidence of acts done by witness as result of conversation also inadmissible:* 22 C. J., 215. *Court to declare the law:* Const. of 1895, Art. V., Sec., 26. *Charge of law of alibi error where no defense of alibi interposed:* 49 S. C., 481; 27 S. E., 484. *Where one of two engaged in unlawful purpose commits a crime:* 16 C. J., 128.

*Mr. Robt. I. Martin,* for appellants, cites: *Whether confession voluntary is question for Court:* 127 S. C., 115; 99 S. C., 505. *Admissibility of evidence of similar crimes:* 128 S. C., 709; 88 S. C., 241; 180 U. S., 356; 45 L. Ed., 573. *Improper cross-examination of defendant as to other crimes:* 120 S. C., 207; 98 S. C., 117; 105 A. S. R., 992. *Admissibility of opinion evidence as to tracks:* 127 S. E., 140; 40 S. C., 330; 118 Ala., 79; 23 So., 776; L. R. A., 1918-A, 736; 2 Whartan on Crim. Ev., 1795. *Charge as to contradictory statements erroneous:* 8 N. M., 543; 46 P., 18; 160 U. S., 474; 40 L. Ed., 479; 16 C. J., 960. *Duty of Court to charge the law:* 109 S. C., 253; 87 S. C., 534; 68

S. C., 429; 67 S. C., 330; 58 S. C., 94; 180 U. S., 361; 45 L. Ed., 573. *Same; law of self-defense:* 106 S. C., 274. *Where one of two engaged in unlawful purpose commits a crime:* 70 S. C., 454; 12 C. J., 641; 16 C. J., 128; Underhill on Crim. Ev., 796; Clark on Crim. Law, 3rd Ed., 115. *Affidavit that witness for prosecution made statements out of Court contradicting his testimony at trial deemed after-discovered evidence and ground for new trial:* 116 S. C., 281; 106 S. C., 439.

*Messrs. J. G. Leatherwood, Solicitor,* and *Dean, Cothran & Wyche,* for respondent cite: *Court to determine if confession voluntary:* 16 S. C., 113; 107 S. E., 149. *Admissibility of evidence of other crimes:* 88 S. C., 239. *Failure to charge law of self-defense no error in absence of evidence of self-defense;* 85 S. C., 229; 67 S. E., 237. *Who are principals:* 88 S. C., 204; 70 S. E., 417.

January 25, 1926.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE MARION.

The defendants, Alex Pittman and his son, Holland Pittman, were jointly indicted and tried for and convicted of the murder of J. H. Howard before Hon. T. J. Mauldin, Circuit Judge, and a jury. The execution of the sentence of death was stayed by notice of intention to appeal to this Court. Subsequently, a motion for a new trial on after-discovered evidence was made in the Circuit Court before Hon. H. F. Rice, and the motion refused. This appeal is from the judgment on sentence by Judge T. J. Mauldin and from the order, refusing a new trial on after-discovered evidence, by Judge H. F. Rice.

The gravity of the issues involved and the character of certain of the questions raised by the exceptions warrant a more or less extended reference to the evidential facts as disclosed by the record. The scene of the homicide is the foot of Hog Back Mountain in Glassy Mountain township,

County of Greenville, some 30 miles northwest of the City
of Greenville.  That location has both a geographical and
historical aspect of which this Court may properly take
judicial cognizance.  It is a picturesque region of wooded
mountain ridges and valleys, of cliffs and gorges, a typical
section of the beautiful Blue Ridge range of the Appala-
.chian Mountains.  In the fastnesses of these mountains,
south of Mason and Dixon's line, have lived for more than
a century a sturdy, virile white people of probably as pure
Anglo-Saxon stock as America can boast.  Remote and
isolated by the inaccessibility of their mountain homes, for a
century or more they lived in a world apart, practically
untouched and uninfluenced by the currents and tides of
social and economic progress which flowed and rose and
ebbed in the great world beyond their mountain barriers.
The gift of the mountains to their children has always been
a love of liberty.  That love of liberty, fostered by the isola-
tion of their mountain life, is doubtless responsible, in a
measure, for the antipathy of these people to the law of
legislative halls and of Courts.  In no more striking way,
perhaps, has this characteristic been evinced and illustrated
than by the tenacity with which they have clung to the con-
viction that their right to convert the corn, grown in their
valleys and coves, into whisky, is a God-given and inalienable
right.

Prior to the adoption of the Eighteenth Amendment to
the Federal Constitution, these people, or many of them,
persisted in asserting that right as against the revenue officers
of the Federal Government, and since the enactment of the
National Prohibiton Law (U. S. Comp. St. § 101381/4
et seq.), the phenomenal increase in market value of "moon-
shine" has doubtless furnished little incentive to depart
from the "tradition of the elders."  Certain characteristics,
for which that faith and practice are perhaps largely re-
sponsible, are manifested by a marked tendency to secre-
tiveness and suspicion in all social and business contracts

with outsiders, and by a strong inclination to settle scores
among themselves in accordance with the spirit of the
vendetta—a spirit, however, which in fairness, it may be
said, competent observers have ascribed, in part at least, to
the influence of ancestral traditions reaching back to the
days of chivalry, the Reformation, and the clan. The record
in the case before us is reminiscent of the pages of stories
by Miss Murfree (Charles Egbert Craddock), John Fox, Jr.,
and other modern writers, who have written with compelling
interest and charm of the lives of these Southern
mountaineers. While in a court of law murder is murder,
and the halo of mountain romance fades into the dull and
somber hues of sordid tragedy, the foregoing general
observations as to the setting of this crime and as to the
racial characteristics of the people who figured almost
exclusively as *dramatis personæ* in the trial below are not
without pertinent bearing in appraising the contentions of
the parties, with respect to the relevancy and weight of
testimony.

About noon on the 31st of January, 1924, Reuben Gosnell,
a prohibition agent of the federal government, and J. H.
Howard, a State constable, approached an illicit distillery
in the locality above referred to. When within a short
distance of the distillery, Gosnell saw the upper part of a
man, who appeared to be talking to some one. Gosnell
concealed himself on one side, and Howard approached the
distillery from another angle. When Howard was within
about 30 yards of the distillery, Gosnell saw Howard "make
a break to run" and ran "right into the distillery." Gosnell,
who could not see into the distillery, heard the voice of a
man or of men cursing, and heard Howard call his (Gos-
nell's) name. At or about the same time Gosnell heard
several shots fired in the distillery. He testified he then saw
two men run from the distillery, one going toward the west
and the other toward the east. He gave chase to the man
on his side running toward the east and captured the defend-

ant, Holland Pittman, who at the time of his capture drew or tried to draw a loaded 45-caliber pistol which had not been fired. Gosnell then went back to the distillery with Holland Pittman, and found J. H. Howard dead, his pistol lying within 2 feet of him, with the hammer on an empty chamber (not empty cartridge). He had been shot five times, one bullet entering from the front and the others from the back.

Gosnell, with his prisoner, then went back more than a quarter of a mile to where he and the deceased on their way to the distillery had left Austin, another prohibition agent, and Clarence Howard, a son of the deceased who had in charge two Plumley boys, who had been arrested earlier that morning on a charge of distilling. The point at which Austin and the others had been left was at a crib near a camp or lookout. This camp was under a big cliff, well concealed, at a point from which one could "see up and down the valley." Bedclothing, cooking utensils, rations, and men's clothing, including two hats, had been found at this camp by Gosnell and Howard on their way to the distillery where Howard was killed. At that time Howard identified the hats, and, in consequence of that identification, Gosnell testified they were looking for Alex Pittman and his younger son, Fred Pittman, at the still. After meeting the Austin party at the crib (after the homicide) and telling them what had happened, Gosnell arranged for Clarence Howard to take the Plumley boys on to Greenville, and with Austin, his fellow officer, and the defendant, Holland Pittman, went back to the still, where the deceased Howard lay dead. On the way back, within 200 yards of the still, they were fired on from ambush. Gosnell then told the prisoner, Hol Pittman, that it "looked like" they were "all going to be killed," and that if he didn't tell him who killed Howard he would kill (Pittman.) Pittman then made a statement, which was reiterated several hours after Gosnell's threat to kill, to the effect that one Henry Lindsay

had shot and killed Howard. On the road to town that night while in the custody of the officers, Holland Pittman made another statement to a third party to the effect that he expected to have "to go to the electric chair."

At an inquest held the day after the homicide, Gosnell testified substantially to the foregoing facts. He further testified to the effect that he saw from a distance too great for recognition the other man who ran away from the distillery and that the man did not look like Hol Pitman's younger brother, Fred, who was present at the inquest. He then answered questions as follows:

"Q. Have you any idea of your own? A. I couldn't say. * * *

"Q. It wasn't Alex? A. He was a big man.

"Q. You would not say it was not Alex? A. No, sir.

"You know Alex pretty well, don't you? A. I have known Alex for years. * * *

"Q. As to Alex Pittman here, you won't swear it was not him? Would you swear it was? A. I would not be willing to swear; no, sir."

On the Sunday following the killing on Thursday, Gosnell again went to the distillery and was shown by Wade Plumley certain tracks going from the distillery in the direction "the other man" ran on the day of the homicide. At an inquest held on Monday of the following week, both Gosnell and Plumley testified that, in their opinion the tracks were the tracks of Alex Pittman.

On the trial below, the defendant, Holland Pittman, did not take the stand. His position there, and his contention here, is that the only reasonable inference from the state's evidence establishing his presence at the distillery and his precipitate flight therefrom with a pistol on his person which had not been fired, is that he did not shoot the deceased, and that the statements made by him while under arrest are wholly ineffective to preclude that inference, because made

under duress. Alex Pittman, the father, took the stand and set up the affirmative defense of alibi. He contends that he was on good terms with his neighbor, the deceased Howard; that, like Constable Howard, he had quit the illicit manufacture of liquor, and had not engaged therein for several years; that on the day of the homicide he was at his home shucking corn in his crib from early morning until 4 o'clock in the afternoon; that his home is more than 6 miles from the place of the distillery; that his son, Holland, had left home the evening before, and that he knew nothing of his destination then or his whereabouts next day; and that he heard for the first time the news of the trouble at the distillery when his children returned from school about 4 o'clock. He further contends that the force of Gosnell's testimony upon which the State relied to overcome his plea of alibi and to identify him as the other man, who ran from the distillery, is destroyed or certainly rendered ineffective to prove guilt, beyond a reasonable doubt, by radical differences between the testimony of Gosnell at the inquest and his testimony at the trial. These alleged variances will be hereinafter adverted to.

The contentions of the State, on the other hand, are that, whether due to the greater activity of law officers since the enactment of the National Prohibition Law, or to the telephone, the automobile, and improved roads which have measurably leveled the barriers of distance and seclusion, or to other causes, the tide of a new day of churches and schools, and of economic and social progress is rising in Glassy Mountain township; that a representative of this new order was J. H. Howard, the deceased, a native and resident of this mountain district, the father of seven or eight sons (one a ministerial student at Furman University), a State constable serving without pay, and a sincere and zealous convert to the belief that the blockade distillery, with its physical fruitage of "chain lightning," and its spiritual fruitage of suspicion, of furtive and devious shifts, of fear and of hate,

is the curse of the mountains; that Alex Pittman, a man about 50 years of age, of stalwart physique, the father of the other defendant and of other sons, was an outstanding representative of the old order in this mountain community —an experienced and successful manufacturer of illicit liquor, a skilled woodsman, an artful evader of the law's pitfalls, and an unreconstructed adherent of the ancient mountain code; that the attitude of Pittman toward Constable Howard was peculiarly hostile, in that he regarded him not only as a soldier in the ranks of the enemy, but as a renegade who deserved short shrift at the hands of mountain men on the firing line—a feeling evidenced by an alleged threat that if Hol Howard ever came on him "stilling" he would kill him; that Pittman's method of conducting stilling enterprise, as indicated by prior undertakings of the kind in which he had been implicated, was the method employed in running the distillery in which Howard was killed—at a considerable distance from his home, with a skillfully placed and comfortably provisioned camp or lookout in the neighborhood; that Pittman was a large man of great physical strength, more likely than the ordinary man, when not clearly within sight, to make a distinctive impression through voice and physical carriage, and capable of making such impression by his shod footprints on the ground; that Gosnell, the officer, who from a distance too great for positive identification saw the other man run from the distillery was himself a native of these mountains, one "to the manor born," trained from infancy in the fine mountain art of acute and accurate observation and in the reading of tracks and signs, that would be meaningless to the ordinary observer; that Gosnell had been for 19 years engaged as a government agent in hunting and "cutting" illicit stills in this territory, that he knew the people and every foot of the ground, that he had known Alex Pittman for 30 years, that he knew his methods of "stilling," his voice, his carriage, his tracks, etc; and that his testimony, grounded on the physical indicia

detailed by him and supported by that of Plumley as to the tracks, taken in connection with the indisputable fact that Alex Pittman's son residing in his father's house, was in the distillery at the time of the homicide, and with other evidential facts tending to rebut the defense of alibi, made a clear case of guilt as to Alex Pittman.

As to Holland Pittman, it is contended, broadly, that the evidential facts, certain of which have been outlined above —and others of which, as to the position of the body of the deceased with reference to the direction of his approach and as to the location of the bullet holes in his body with reference to the direction in which the two men ran, have not been stated—establish that Holland Pittman participated in the shooting of the deceased with a pistol other than that found on his person; and that, in any view, the evidence is open to no other reasonable inference than that he was present and aided and abetted in the shooting of Howard by "the other man," his father.

The exceptions of the appellants which will be first considered are those (21 to 28, inclusive) which assign error in the refusal of Judge Rice to grant a new trial on after-discovered evidence. The alleged newly discovered evidence mainly relied on to impugn the soundness of Judge Rice's conclusion is that contained in the affidavits of C. A. Rector, Sheriff, W. J. Howard, a brother of the deceased, and Morris Plumley, tending to impeach the testimony of the State's witness, Reuben Gosnell, and in the affidavits of Early Harrison, Rufus Plumley, and H. S. Howard, a nephew of the deceased, tending to support the alibi plea of Alex Pittman.

The affidavits of Sheriff Rector were to the effect that, on the morning after the homicide, Reuben Gosnell was in his office and made the point-blank assertion that the other man who ran from the distillery could not possibly have been Alex Pittman; that "it was not him," etc. The affidavits of W. J. Howard and Morris Plumley were to the effect that

they were at the distillery shortly after the killing and found Reuben Gosnell with Hol Pittman under arrest, and that Gosnell then stated to Howard that he thought Hol Pittman did the killing. These were met by counter affidavits from Gosnell, expressly denying that he made the statements attributed to him by Rector, and alleging that he and the Sheriff were not on friendly terms, that he had no confidence in the Sheriff's desire to discover the identity of the other man, and that he was careful never to talk to the Sheriff, except in the presence of a third party, etc.; that the statements of W. J. Howard and Morris Plumley were untrue and that W. J. Howard had been arrested for violation of the liquor laws and was reputed to be in the liquor business, etc. Other impeaching affidavits were produced by the State.

Under the well-established general rule that newly discovered evidence which "merely impeaches or contradicts the testimony of a witness at the trial" (*State v. Marks,* 70 S. C., 448; 50 S. E., 14. *State v. Workman,* 38 S. C., 550; 16 S. E., 770; and, see *State v. Don Carlos,* 38 S. C., 225; 16 S. E., 832. *State v. Rhodes,* 44 S. C., 325; 21 S. E., 807; 22 S. E., 306) affords no sufficient ground for a new trial, Judge Rice held that the affidavits of the tenor indicated were insufficient to sustain the motion. In that view we concur.

It is true that, when it is made clear by after-discovered evidence that a witness was mistaken in giving only or controlling testimony to a material fact, or that the testimony of witnesses on which the verdict proceeded was founded on particular circumstances which have been clearly falsified, a new trial should be granted. *Turner v. So. Ry. Co.,* 121 S. C., 159; 113 S. E., 360. But that is not the showing here made. The affidavits of Rector, Howard (W. J.), and Plumley merely tended to establish that Gosnell had made certain extrajudicial statements which were contradictory of his testimony on the trial. But, as noted above, the contention that Gosnell had made state-

ments under oath of the selfsame contridictory character at the inquest on the day after the homicide was vigorously urged by defendant's counsel at the trial. If, as now contended, this newly discovered testimony tended to strengthen the impeaching force of Gosnell's statements at the inquest, it was at best merely cumulative. If, on the other hand, the testimony of Gosnell at the inquest was not essentially different from his testimony at the trial, it is not probable that the force and effect of the statements made by him at the inquest—statements under oath made on the day after the · homicide—would be appreciably affected by loose declarations alleged to have been made to other persons, especially when the making of such declarations is categorically denied by Gosnell. In this connection, we may say in passing that we have carefully compared the testimony of Gosnell at the inquest with his testimony on the trial, and are not impresssed with the view that there was any vital or material variance. The decision in the case of *State v. Bethune*, 104 S. C., 353; 89 S. E., 153, cited by appellants, where a new trial was granted upon the affidavit of an assistant Solicitor to the effect that a state's witness had made a contradictory statement to him as to a vital point in the case, was expressly predicated upon the theory that the testimony of a Solicitor or assistant Solicitor, a *quasi judicial* officer, as to information obtained in the discharge of his official duty, stood upon a different footing from that of other witnesses; and it is obvious, we think, as Judge Rice correctly held, that the question here presented is not ruled by that case.

As to the testimony of Early Harrison, Rufus Plumley, and H. S. Howard, tending to corroborate Alex Pittman's plea of alibi, we think the Circuit Judge correctly held that it was merely cumulative. It · is true that newly discovered testimony, which is in a sense cumulative, may throw such new light on a vital issue and may be of such compelling force as. clearly to require a new trial in the interest of justice. Such was the character

of the after-discovered evidence in the cases of *State v. Wiley,* 106 S. C., 439; 91 S. E., 382, and *State v. Casey,* 116 S. C., 281; 108 S. E., 112, cited by appellants. But the testimony here relied on is not, as we apprehend, reasonably susceptible of that classification or evaluation. The affidavit of Harrison and of Rufus Plumley was to the effect that, in returning from coon hunting, they passed the still about an hour or half hour before the killing, and saw Hol Pittman and another young man about Hol's age at work there, and that Alex Pittman was not in the still. That this somewhat vague account of a visit to the still and of seeing an unknown or unnamed individual other than Alex Pittman would, even if accepted at face value, have little probative force to establish the absence of Alex Pittman from the still at the time of the killlng an hour or half hour afterwards is apparent. The affidavit of H. S. Howard, dated October 9, 1924, was to the effect that he was a nephew of the deceased, J. H. Howard; that on the 31st of January, 1924, the day his uncle was killed, he passed the home of Alex Pittman about 11:30 o' clock a. m.; that he saw Alex Pittman there at that time, was invited by him to take dinner, declined the invitation, and invited Pittman to go hunting with him, Pittman declining on the ground he had to stay and finish shucking corn; and that his reason for not furnishing this testimony sooner was that he had been evading arrest for violation of the Prohibition Law and had been deterred by a report that any assistance given the Pittmans would be used against parties in all liquor cases in the Federal Court. A counter affidavit by Reuben Gosnell was to the effect that, 10 or 15 days before the murder of J. H. Howard, he and the said J. H. Howard had found and destroyed a distillery within a short distance of H. S. Howard's home, which distillery was reputed to be, and bore evidence of being, the property of H. S. Howard, who was then under indictment for the operation of said still. On the trial both Alex Pittman and his wife testified that Alex was at home at the time

H. S. Howard claimed to have seen him there. In response to questions as to who had passed or been at the house that day neither mentioned that H. S. Howard had been there. If Alex Pittman was at home when H. S. Howard claims to have seen him there, he could not have been present at the scene of the homicide.

For the purposes of the motion for new trial Alex Pittman made an affidavit to the effect that the statement of H. S. Howard as to the meeting at Alex's home was true, but that it was "unfortunately overlooked" by him before trial. How this important meeting, if it occurred, could have been overlooked by Alex Pittman, whose story, as to his presence at home at or near the time of the killing six miles away, was directly corroborated by his wife alone, it is difficult to conceive. The source of this alleged newly discovered testimony, its belated advent upon the scene, its strange "overlooking" by Alex Pittman, all tend so strongly to cast suspicion upon its verity that we think the conclusion of the Circuit Judge that it was cumulative testimony of a character which would not probably have changed the result of the trial was clearly required and soundly reached. The same conclusion, we think, was also clearly required as to the other affidavits, which are not specifically discussed in appellants' printed briefs and which warrant no more specific reference here. The exception assigning error in the refusal of Judge Rice to grant a new trial on after-discovered evidence must, therefore, be overruled.

The exceptions imputing error in the trial of the case by his Honor, Judge T. J. Mauldin, will be next considered.

The appellants' first contention in that regard (exceptions, 1, 2, 3, 14 and 19) is that error was committed in admitting over objection certain declarations of the defendant, Hol Pittman, made under duress. The nature of these statements and the circumstances under which they were made are indicated in the narrative statement of facts above set out. As to the statements of Hol

Pittman to the effect that the still belonged to Fay Pittman and Henry Lindsay, and that Henry Lindsay was the man that did the shooting or the other man who ran from the distillery, these statements were admitted by the trial Court upon the testimony of Gosnell that they were volutarily made or repeated in the course of a "pleasant conversation" several hours after Gosnell had threatened to kill his prisoner, if he did not tell who the other man was. But whether those statements were made under the influence of Gosnell's previous threat, we think, is wholly immaterial. The statements were neither in form nor tenor such a "confession" of guilt as falls within the rule excluding confessions which are not voluntary made.

"A 'confession,' in a legal sense, is restricted to an acknowledgment of guilt made by a person after an offense has been committed, and does not apply to a mere statement * * * of an independent fact from which such guilt may be inferred." *State v. Reinhart,* 26 Or., 466; 38 P., 822. *People v. Molineux,* 168 N. Y., 264; 61 N. E., 286; 62 L. R. A., 193. *State v. Campbell,* 73 Kan., 688; 85 P., 784; 9 L. R. A. (N. S.), 533; 9 Ann. Cas., 1203. Wigmore on Evidence (1st Ed.) § 821.

And see *State v. Lyle,* 125 S. C., 406; 118 S. E., 803.

In the case of *State v. Broughton,* 29 N. C., 96; 45 Am. Dec., 507, the Court said:

"But it is altogether a mistake to call this evidence of a confession by the prisoner. It has nothing of that character. It was not an admission of his own guilt, but, on the contrary, an accusation of another person. That it was preferred on oath in no way detracts from the inference that may be drawn from it unfavorably to the prisoner, as being a false accusation against another, and thus furnishing, with other things, an argument of his own guilt. There was, in our opinion, no error in receiving the evidence."

This statement of Hol Pittman to the effect that Henry Lindsay was in the distillery with him or was the other man who ran, etc., was in no respect

an admission of his own guilt; it was merely a false accusation (apparently) of another person, and fell clearly within the general rule, "that all a party has said, which is relevant to the questions involved in the trial, is admissible in evidence against him." *Hendrickson v. People,* 10 N. Y., 13; 61 Am. Dec., 721.

As to the other statement of Hol Pittman while in the custody of the officers—"I guess I will have to go to the electric chair"—it is apparent that that statement likewise may hardly · be construed as an unequivocal acknowledgment of guilt. But, conceding for present purposes that its admission in evidence should be determined by the rule governing the admission of confessions, we think the ruling of the trial Judge was correct. The statement was made by the prisoner in conversation with D. D. Smith on the way to Greenville about 8 or 9 o'clock of the evening after the homicide, and several hours after Gosnell's threat to kill. The prisoner told Smith he had a knife and a pair of pliers which he wanted Smith to take and give to his mother; that he didn't guess he would need them any more; that he guessed he would "have to go to the electric chair." His reference to the "electric chair" is inconsistent with an inference that he was then inspired and actuated by any fear of death or maltreatment at the hands of Gosnell or any one there present, and the occasion and nature of the remark furnish little, if any, basis for a finding that it was involuntary. Certainly, the admission of the evidence and the submission to the jury under appropriate instructions of the question as to whether or not it was the product of duress, may not soundly be pronounced error of law. *State v. Danelly,* 116 S. C., 113; 107 S. E., 149; 14 A. L. R., 1420. *State v. Lyle, supra; State v. McAlister,* 133 S. C., 99; 130 S. E., 511, filed Nov. 17, 1925.

It is contended, however (exception 14), that, in view of the admission of the statement of Hol Howard as to Henry Linsday being the other man with him in the still,

the falsity of which statement seems to have been tacitly conceded by the defense at the trial, the trial Court committed reversible error in charging at the State's request, as follows:

"I charge you that if you find that either of the defendants has made false or contradictory explanations of incriminating circumstances, such fact in connection with the other circumstances may be sufficient to warrant the inference of his guilt. That is true likewise where he had made false and improbable or contradictory statements with regard to the occurrence and as to his whereabouts; it being always a matter for the jury to decide whether such evidence convinces them beyond a reasonable doubt of the guilt of the accused."

As an abstract proposition, the charge was not erroneous, and we cannot say that the effect of giving the instruction was so unduly to stress one of the State's contentions of fact—the only plausible ground of criticism—as to amount to an abuse of the Court's discretion in the conduct of the trial. See 16 C. J., 960. The exception is overruled.

The next group of exceptions (4, 6, 7, 8, 10, 11, 30, 31, and 32) are directed to the contention that the Court committed reversible error in permitting the State to adduce testimony and to cross-examine the defendants' witnesses as to other offenses committed by the defendant, Alex Pittman. The evidence which appellants say should have been excluded upon objection tended to establish that Alex Pittman had for years been engaged in running blockade distilleries, that he had a peculiar or distinctive method of operating a distillery, etc. Certain questions propounded by the Solicitor, as to Alex Pittman having inflicted corporal punishment upon his sister for reporting his illicit liquor operations, are made the basis of exceptions 7 and 8. Answers to the questions however, were upon objection excluded by the trial Judge. In the case of *State v. Richey*, 88 S. C., 239, 70 S. E., 729, and again in *State v. Lyle*, 125

S. C., 406; 118 S. E., 803, this Court quoted and adopted, as a correct statement of the law applicable to the question here presented, the following from the opinion of Justice Werner in *People v. Molineux, supra:*

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. (Wharton on Crim. Ev., [9th Ed.] § 48; Underhill on Ev. § 58; Abbott's Trial Brief, Crim. Trials, § 598)."

In *State v. Lyle, supra,* the Court said:

"Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sough to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime."

In the light of the setting of the crime, of the circumstances having to do with the antecedents and environment of the actors and witnesses, to which somewhat extended reference has been made above, we think it is sufficiently clear, without argumentative comment, that the evidence as to other offenses here objected to fell within at least two of the recognized exceptions to the general rule, in that it tended to prove (1) motive, and (2) the identity of the person charged with the commission of the crime on trial. The contentions of the State were (a) that Alex Pittman had a personal grudge against the deceased, J. H. Howard, because of his attitude on the liquor question and of his interference with the defendant's illicit liquor operations;

(b) that the motive of the defendant, Alex Pittman, for killing the deceased was the composite product of that grudge and of self-interest in eliminating a dangerous witness and active disturber of his illicit liquor business; and (c) that this defendant had a distinctive method of conducting a stilling operation and that the similarity between a formი distilling outfit and the one found where the deceased was killed could be proved as a relevant circumstance tending to show that the defendant, Alex Pittman, owned and operated the distillery at which the homicide occurred. We think the evidence was logically relevant to support those contentions, and that its admission was not erroneous.

It is further charged (Exception 9) that the trial Court erred in permitting the witness Gosnell to testify that certain hats found at the camp near the distillery were identified by the deceased, J. H. Howard, and as a result of such identification the witness was expecting to find Alex Pittman at the distillery. The objection interposed at the trial was to "what Mr. Hol Howard (the deceased) did because the defendants were not there." The Court ruled that the fact that the hats were identified was "competent," but excluded an answer to the Solicitor's question as to whether they were identified "as belonging to Alex Pittman." Thereafter, the Solicitor asked the witness if, in consequence of what was said by the deceased, he (the witness) was "looking for Alex Pittman at the distillery." No objection was interposed in apt time by defendants' counsel, and the question was answered in the affirmative. Thereafter the Court, *sua sponte,* admonished the witness, "Don't say what was said," etc. No motion was made to strike the testimony thus elicited as to the witness' expectation of finding Alex Pittman and Fred Pittman at the still. If it be conceded that the admission of this testimony was tantamount of the admission of declarations of the deceased to the effect that one of the hats found was the property of Alex Pittman, its admission may hardly be justified under any of the

recognized exceptions to the hearsay rule. But the absence of objection on that ground in apt time indicates that its admission was not so regarded by defendants' counsel at the trial. There is the further consideration that objection to this testimony in the form elicited—that Gosnell was expecting to find Alex Pittman at the still—might well have been withheld upon the ground that it had an obvious tendency to weaken the force of Gosnell's identification of "the other man" who ran from the still as Alex Pittman, upon the more or less valid theory that men engaged in a quest of this character usually see and find what they expect to see and find. In any view, the record does not disclose that the appellants are in position to claim that the trial Court committed prejudicial error with respect to the admission of this testimony, and the exception so charging must be overruled.

Appellants' next contention (exceptions 12 and 13) is that the presiding Judge erred in permitting the State's witness, Wade Pumley, to express the opinion that a track found near the still two days after the homicide was the track of the defendant, Alex Pittman. The record discloses that the Solicitor elicited from this witness, without objection, testimony to the effect that he had raided these mountains "quite a bit for liquor"; that he had known Alex Pittman nearly all of his (witness') life; that he had tracked Alex Pittman "around a right smart"; that he thought he knew Alex Pittman's track; and that he thought the track in question "was Mr. Pittman's track." The examination then proceeded as follows:

"Q. Alex Pittman's track? A. Yes, sir, and I said so at the time."

"Mr. Bowen: I object to that.

"The Court: Well, it is nothing but an expression of his, as he expressed it; it is not contended that he said it to anybody," etc.

No objection having been interposed to the witness' prior

expression of opinion as to the track, the objection as made after the answer to the last question had been given was evidently directed to the witness' statement that he had "said so at the time," and was so interpreted by the trial Judge without protest from counsel. It is patent, we think, that the Court's ruling may not be pronounced erroneous. Even if the objection be construed as a motion to strike out an improper answer not responsive to the question propounded, appellants' position is untenable. The witness' statement was not as to a declaration by a third party, which might have been inadmissible under the hearsay rule, but was in substance nothing more than an expression of the same opinion the witness had already expressed on the stand— that the tracks observed at a certain time and place were the tracks of Alex Pittman.

We deem it proper to add that, even if the introduction of the testimony of this witness as to the identity of the tracks had been objected to in apt time, we are inclined to the view that its admission over objection would not have constituted reversible error. "Track" testimony of exactly the same character had previously been elicited form the witness, Gosnell, without objection from the defense, and the merits of the question as to admissibility are to be determined from the viewpoint of an objection to both his and Plumley's testimony. The general rule, unquestionably, in this State is that the ordinary witness who undertakes to testify as to the resemblance or identity of tracks should be confined to a detailed statement of the facts tending to establish the identity of the footprint in question with that of the accused (*State v. Green,* 40 S. C., 328; 18 S. E., 933, 42 Am. St. Rep., 872, and other cases) or to stating the inference, upon the basis of the facts detailed, that the tracks resembled the tracks of the accused (*State v. Campbell,* 131 S. C., 357; 127 S. E., 440.) That view proceeds upon assumptions that in this industrial age of custom-made shoes and of dense population, of streets and

cities, the footprints of men are not a subject of expert testimony; that all facts as to size, shape and peculiarities which are likely to be of assistance to a jury in forming a conclusion as to the identity of the person who made the footprints can be detailed in words; that the jurors are as well qualified to draw the inference from the facts observed and stated as the witness; and that to permit the witness to draw an inference and express an opinion as to the intimate fact of identity would be to admit a species of evidence that is without probative value and potentially misleading.

However valid those assumptions in the ordinary case, we think it is evident that cases may arise in which they are obviously without foundation. The fact that men by virtue of peculiar and special experience may acquire peculiar knowledge of the subject of footprints and special skill in its application is scarcely open to question. The skill of the Indian, and of the trained white scout of our pioneering days, in distinguishing and following tracks, is accepted as a sufficiently well-authenticated fact to warrant its being taught to "young America" in the schools. That what Mark Twain makes one of his characters call the "physiological autograph" of a man, which can neither be counterfeited nor disguised, may be written even with the shod foot, is not, we think, so impropable a theory as to warrant the Courts in refusing to permit the introduction of a class of evidence as to tracks, which, as to other and closely analogous subjects, is freely admitted as expert testimony. In the case at bar, the witness Gosnell testified that he knew Alex Pittman's track in that mountain terrrain; that he had known his track when seen in those mountains for 15 years; that he had tracked him all over those mountains; that he had cut distilleries at his house and run him out of distilleries; that he "goes fast, he steps long" and wears a "broad big shoe," worn at the toes, sticks his heel "in the ground terrible" in going down hill, etc. The testimony

of Plumley, subsequently given, was not so detailed as to his experiential qualification to speak as an expert on Alex Pittman's track, but was of much the same tenor. In *State v. Ancheta* (1915) 20 N. M., 19; 145 P., 1086, "the testimony of an Indian that certain tracks which he followed were the same as other tracks known to have been made by the defendant is held admissible." In *Alford v. State,* 47 Fla., 1; 36 So., 436, "a witness who had become acquainted with defendant's track through traveling on the same road to work, and who testified that it was pressed down hard in the outside of the foot and the inside of the heel was held * * * properly to have been permitted to express his opinion and belief that a certain track seen near the scene of the crime was defendant's." In view of the peculiar and special experiential qualification of these witnesses to speak on the subject of these footprints and of the obvious impossibility of their reproducing in words all of the physical characteristics of the tracks for the benefit of the jury, we think that, under the particular facts of this case, the evidence was admissible.

Appellants' next point (exception 15) is that the trial Court erred in not charging the law of self-defense.

Defendants submitted various requests to charge, but none on self-defense. At the conclusion of his charge, the presiding Judge asked counsel: "Is there anything further?" Counsel for defendants replied: "Nothing for the defense." Self-defense is an affirmative plea. No such plea was tendered or suggested on the trial, and a careful reading of the record has failed to disclose any evidence upon which such a plea could reasonably have been predicated. A charge upon the law of self-defense would not only have been inapplicable, but, under the particular facts of this case, might have been open to criticism as tending to indicate the Court's opinion that the defense of alibi of one defendant had not been sustained, and that the other's plea of not guilty could only be sustained on the theory that he had killed

in self-defense. In the case of *State v. Orr,* 131 S. C., 276; 126 S. E., 766, where it was held not erroneous to charge on self-defense, and in *State v. Williams,* 131 S. C., 294; 127 S. E., 264, where it was held erroneous to charge on self-defense and then to nullify the charge, there were evidential facts adduced by the State upon which, under the general plea of not guilty, the plea of self-defense might reasonably have been predicated, even when the fact of killing by the defendant was not admitted. We think the point here presented is ruled against appellants' contention by the case of *State v. Anderson,* 85 S. C., 229; 67 S. E., 237; 137 Am. St. Rep., 887. And see *State v. Atkins,* 49 S. C., 481; 27 S. E., 484.

Error is imputed to the trial Judge (exception 16) in charging that the defense of alibi was interposed by both defendants, etc. In charging the law as to alibi the Judge used the word "defendants" instead of "defendant," and it is urged that thereby the case of the defendant, Holland Pittman, who had not set up my plea of alibi, was seriously prejudiced. If so, counsel for defendants were *in pari delicto* since their second and third requests to charge, which were given by the Court, embodied the same error. The exception is obviously without merit and is overruled.

It is further contended (exceptions 17 and 20) that the Court erred in charging as follows:

"Gentlemen, if two or more persons enter upon an unlawful enterprise to do an unlawful act and that act is done, and if an unlawful act is done pursuant to such an arrrangement, or if two or more persons enter upon the doing of an unlawful act, one is as guilty as the other. And I refer you, so far as this case is concerned, to the evidence to determine whether or not this evidence brings this case within the purview of that principle, along with all the other law as I have endeavored to state it to you."

ments under oath of the selfsame contradictory character at following colloquy between the Court and one of the counsel for the State:

"Gentlemen, is there anything further?

"Mr. Dean: Would your Honor charge the jury as to who are principals when two or more are present?

"The Court: Yes; I overlooked that."

The setting of this instruction very clearly indicates that the "unlawful act" to which the Court had reference was the crime of murder for which the defendants were on trial. So read and construed, while the charge might be open to criticism of state's counsel that it did not clearly present the the principle to which counsel's request was directed—that "all persons present aiding and abetting a murder are regarded as principals and equally guilty" (*State v. Davis,* 88 S. C., 204; 70 S. E., 417, and cases there cited)—we can see no valid ground for criticism from the viewpoint of defendants. Whether the words "unlawful act" be construed to mean "murder" or the "manfacture of illicit liquor," the instruction was not technically erroneous and was in any view harmless, in that it merely stated in effect the axiomatic proposition that, where two or more persons actually participate in the commission of a crime, one is as guilty as the other. See *State v. Hunter,* 79 S. C., 73, 75; 60 S. E., 240.

The only remaining exceptions (18 and 29) are directed to the contentions (1) that the circuit Judge committed error of law in refusing to grant a new trial on the ground that there was no evidence to warrant a conviction of the defendant, Holland Pittman, and (2) that the circumstantial evidence was legally insufficient to convict either of the defendants. Waiving any question as to whether the latter contention is properly presented for review by this Court, we are of the opinion that the evidential facts set out above are sufficient, without argumentative discussion, to vindicate the conclusions that the circuit Judge

committed no error in refusing the new trial, and that there was ample evidence to support the verdict of the jury.

A careful review of the record has disclosed no prejudicial error, and all exceptions must be overruled. The judgment of the Circuit Court is, therefore, affirmed.

MESSRS. JUSTICES WATTS and COTHRAN and MR. ACTING ASSOCIATE JUSTICE PURDY concur.

MR. CHIEF JUSTICE GARY did not participate.

### ON PETITION FOR REHEARING

MR. ACTING ASSOCIATE JUSTICE MARION: The opinion of the Court heretofore filed was prepared by the writer after painstaking examination of the record and careful consideration of the points raised by the 32 exceptions. That no material question either of fact or of law overlooked or disregarded is, as he apprehends, conceded by the members of the Court who are now disposed to grant a rehearing upon the ground that the points raised by Exceptions 9 and 14 were erroneously decided. In deference to these Justices, for whose views he entertains profound respect, as well as from a desire to give the appellants the benefit of any substantial doubt in the determination of the points raised by this appeal, the writer has re-examined and reconsidered the question raised by these exceptions. Inasmuch as the result of such reconsideration has been to confirm, rather than to unsettle, the writer in the opinion that those questions were correctly decided, it is perhaps in order that these particular exceptions (9 and 14) should be somewhat more fully discussed and argued than was deemed necessary in the preparation of the opinion filed.

The portion of the record upon which exception 9 is grounded is as follows:

"Q. Now, Mr. Gosnell, you say that three hats were found at the camp place? A. No, sir; I just saw two.

"Q. And you say they were identified by Mr. Hol Howard as belonging to somebody?

"Mr. Bowen: I object to what Mr. Hol Howard did, because the defendants were not there. What Mr. Howard did would certainly be incompetent as to the defendants.

"The Court: Well, Mr. Solicitor—

"The Solicitor: I don't want any conversation. I just want the substantive fact that they were identified as belonging to two certain people on the way to the distillery by Mr. Hol Howard.

"Q. Were these hats identified by Mr. Hol Howard? A. Yes, sir.

"Q. As belonging to Alex Pittman?

"The Court: Hold on. The fact that they were identified is competent.

"Q. Well, were they identified? In consequence of what he told you, were you looking for Alex Pittman at the distillery? A. Yes, sir.

"Q. In consequence of what he told you, you expected to see Alex Pittman and Holland Pittman at the distillery? A. You got that wrong about Holland; I said Fred.

"Q. Fred and Alex? A. Yes, sir.

"Q. There were three at the camp and Holland's was the third one? A. I never said there was three. I said this: That the two hats were identified, one as being—

"The Court: Hold on. Don't say what was said by way of justification.

"Q. They were identified. In consequence of that identification you were looking for Alex Pittman and who else at the distillery? A. Well, Alex Pittman and Fred Pittman.

"Mr. Bowen: All of that is objected to."

The opinion thus disposes of this exception:

"It is further charged (exception 9) that the trial Court erred in permitting the witness, Gosnell, to testify that certain hats found at the camp near the distillery were

identified by the deceased, J. H. Howard, and as a result of such identification the witness was expecting to find Alex Pittman at the distillery. The objection interposed at the trial was to 'what Mr. Hol Howard (the deceased) did, because the defendants were not there.' The Court ruled that the fact that the hats were identified was 'competent,' but excluded an answer to the Solicitor's question as to whether they were identified 'as belonging to Alex Pittman.' Thereafter the Solicitor asked the witness, if, in consequence of what was said by the deceased, he (the witness) was 'looking for Alex Pittman at the distillery.' No objection was interposed in apt time by defendants' counsel, and the question was answered in the affirmative. Thereafter the Court, *sua sponte,* admonished the witness: 'Don't say what was said,' etc. No motion was made to strike the testimony thus elicited as to the witness' exception of finding Alex Pittman and Fred Pittman at the still. If it be conceded that the admission of this testimony was tantamount to the admission of declarations of the deceased to the effect that one of the hats found was the property of Alex Pittman, its admission may hardly be justified under any of the recognized exceptions to the hearsay rule. But the absence of objection on that ground in apt time indicates that its admission was not so regarded by defendants' counsel at the trial. There is the further consideration that objection to this testimony in the form elicited—that Gosnell was expecting to find Alex Pittman at the still—might well have been withheld upon the ground that it had an obvious tendency to weaken the force of Gosnell's identification of 'the other man' who ran from the still as Alex Pittman, upon the more or less valid theory that men engaged in a quest of this character usually see and find what they expect to see and find. In any view, the record does not disclose that the appellants are in position to claim that the trial Court committed prejudicial error with respect to the admis-

sion of this testimony, and the exception so charging must be overruled."

That there was no proper objection in due time to the testimony which appellants claim was erroneously admitted would seem to be entirely apparent from a fairly careful reading of the portion of the record set out above. It is true that timely objection was made to the answer of Reuben Gosnell to the question: "And you say the hats were identified by Mr. Holland Howard as belonging to somebody?" And it is true that the Court permitted the Solicitor to elicit an affirmative answer to that question—to the innocuous effect that the hats were identified as belonging "to somebody." But the Court expressly refused to permit an answer to the question: "As belonging to Alex Pittman?" That is, the Court, instead of admitting, expressly excluded the very testimony which appellants now say was admitted in the indirect and inferential form of permitting the witness Gosnell to answer a question subsequently propounded as follows: "In consequence of what he then told you, you were looking for Alex Pittman at the distillery?" But to that question, and its answer, the defendants interposed no objection. It is true that, after this question had been answered without objection, defendant's counsel is recorded as saying, "All that is objected to"; but no motion to strike was made nor any other ruling asked. It would seem perfectly clear that objection was not made in apt time to the introduction of this testimony upon the ground that it was "hearsay" or upon any other ground. An answer to the question in the form propounded would directly disclose a mental condition or attitude of the witness and would only inferentially and indirectly involve a violation of the hearsay rule, and, as pointed out in the opinion, objection by the defense or interposition by the Court might well have been withheld on the ground that an affirmative answer would disclose such a preconception of the situation at the still as would seriously weaken the force of Gosnell's identification

of the other man who ran therefrom as Alex Pittman. It would seem equally clear, therefore, especially in view of the trial Judge's attempts, *sua sponte,* to exclude "hearsay" statements in the examination of the witness Gosnell, that to hold the Circuit Judge guilty of reversible error of law in letting in an answer to a question to which no objection was interposed in due time, or in refusing to strike out when no such ruling was requested, would be to convict the careful Circuit Judge of error of law which he did not in fact commit, and which in fairness should not be imputed to him. Such holding, I think, cannot soundly be squared with any applicable judicial rule or precedent.

The only other ground for predicating a reversal upon the admission of this testimony would be upon the theory that this Court should *in favorem vitæ* take the view that regardless of whether it was properly objected to or whether the trial Court committed any error with respect to its admission, the testimony itself was objectionable and inadmissible under the rules of evidence, and defendants should be given the benefit of that position in the consideration of their apppeal. Laying aside the consideration that this Court has no power of review in such a case save for the purpose of correcting "errors of law"—that is, errors committed by the trial Judge—even if there had been an erroneous ruling by the trial Court with respect to the admission of this testimony, I am satisfied that its admission could not have worked any substantial prejudice to the defendant, Alex Pittman.

The fact which, in its hearsay aspect, this testimony tended to establish, was that the hats of Alex Pittman and his son, Fred Pittman, were found in the lookout camp a quarter of mile from the still which was the scene of the homicide. The state's case against Alex Pittman turned upon whether he was the other man who ran from the still immediately after the killing of Howard. This defendant had made that the decisive issue by setting up the plea

of alibi and testifying that he was at his home six miles away from the still when Howard was killed. The fact that two hats, the property of Alex Pittman and Fred Pittman, were found at this camp had no more probative force, in itself, to establish Alex Pittman's presence at the still at the time of the homicide than it had to establish Fred Pittman's presence—and no contention was made that it had any such force as to Fred Pittman. It was a fact which was entirely consistent with Alex Pittman's absence from the still when Howard was shot, and with the truth of his alibi. On the other hand, the alleged fact as to the hats was no essential, or even material, part of the proof upon which the State relied to establish that Alex Pittman was the other man who ran from the still. That proof consisted primarily in the identification by the witness, Gosnell, through his senses of sight and hearing, of the other man who ran as Alex Pittman. That proof was strongly corroborated by the undisputed fact that the defendant, Holland Pittman, an unmarried son of Alex Pittman living with his father, was found at the still and was captured as he ran therefrom immediately after the shooting of Howard, by the facts that no evidence was adduced by the defense as to the identity of the other man, and that Holland Pittman had made false and contradictory statements as to who this man was, and by the evidence as to Alex Pittman's previous record as an illicit distiller. A finding of fact that the other man who fled from the scene of the crime was Alex Pittman was in no wise dependent upon the circumstance that his hat was found in the camp a quarter of a mile from the still; such circumstances was not an essential link in any chain of circumstantial evidence, and at best it can be regarded as no more than a fragile strand in an evidential cable to which it contributed little, if any strenght. If it afforded any basis for an inference tending to support Gosnell's identification of Alex Pittman, it was merely one circumstance among

other corroborative facts in the light of which it fades into utter insignificance.

But since all such facts, however significant, were merely incidental, subsidiary, and corroborative upon the issue as to the identity of the other man who ran from the still, and inasmuch as the state's case rested primarily upon Gosnell's identification, by sight and hearing, of this man as Alex Pittman, it is obvious that it was of vital interest to this defendant to discredit Gosnell's testimony to the effect, in substance, that he saw Alex Pittman and heard his voice at the still on the occasion of the homicide. The most reasonable if not the only theory upon which to discredit Gosnell's identification by sight and hearing was that his eyes saw and his ears heard what his mind saw and heard or expected to see and hear; that is, that Gosnell's identification was the product of prejudgment, suspicion, and conjecture, and not of what he actually saw and heard at the scene of the homicide. The testimony here under consideration tended directly to establish the very psychological condition on the part of Gosnell which would tend to support that theory, and which would most strongly militate against the trustworthiness of his identification. Instead of excluding it, therefore, Alex Pittman might very wisely have invited its introduction. In no view, therefore, can th admission of this testimony soundly be held to have worked such prejudice to the defendant, Alex Pittman, the only defendant upon whose defense it could have had any bearing whatever, as would justify a reversal.

Exception 14 predicates reversible error upon the following charge, given at the State's request:

"I charge you that if you find that either the defendants has made false or contradictory explanations of incriminating circumstances, such fact in connection with the other circumstances may be sufficient to warrant the inference of his guilt. That is true likewise where he had made false and improbable or contradictory statements with

regard to the occurrence and as to his whereabouts; it being always a matter for the jury to decide whether such evidence convinces them beyond a reasonable doubt of the guilt of the accused."

In the opinion filed the exception to this charge is thus disposed of:

"As an abstract proposition the charge was not erroneous, and we cannot say that the effect giving the instruction was so unduly to stress one of the State's contentions of fact—the only plausible ground of criticism—as to amount to an abuse of the Court's discretion in the conduct of the trial. See 16 C. J., 960."

It is now suggested that the charge complained of "amounts to a charge on the facts." That is not the error specified in the exception as formulated for the consideration of this Court. The error imputed to the trial Judge is that he so charged "after he had admitted in evidence the testimony of Reuben Gosnell and E. N. Austin (as to) admittedly false and contradictory statements made by the defendant, Holland Pittman, when it was frankly admitted by the witnesses for the State that said statements were made under extreme duress and were not free and voluntary, and was thereby highly prejudicial to the rights of the defendants." The question as to whether these statements should have been excluded as made under duress is considered and passed upon in disposing of other exceptions. But, waiving the objection that the point that this charge trenched upon the facts is not raised by the exception, the writer is unable to perceive wherein the charge is open to valid criticism from that point of view. No fact is assumed as proved. Upon the hypothesis that the jury should find a certain fact—which there was evidence tending to establish—the instruction merely announces the correct proposition or conclusion of law that such fact "in connection with the other circumstances may be sufficient to warrant the inference" of guilt. Any relevant and admissible fact adduced

in evidence by the State on such a trial is necessarily a fact from which as a matter of law an inference of the defendant's guilt may properly be drawn; otherwise, such fact has no legitimate place in the evidence.

Unless, therefore, this Court is prepared to go even farther afield and hold that the instruction should have been refused upon the broad ground that the evidential facts and circumstances were insufficient to warrant the inference of the defendant Holland Pittman's guilt, there could be no error in charging that the inference of guilt could be drawn if a certain fact were found, "in connection with the other circumstances" of the case. The charge contains not the slightest reference to or expression of opinion as to the weight and sufficiency of any evidential fact or facts, beyond announcing the entirely correct proposition that such fact or facts "may be sufficient to warrant the inference" of the defendant's guilt; the Court adding in that connection, "it being always a matter for the jury to decide whether such evidence convinces them beyond a reasonable doubt of the guilt of the accused." See, generally, *State v. McIntosh,* 40 S. C., 349; 18 S. E., 1033. *State v. Taylor,* 56 S. C., 360; 34 S. E., 939. *State v. Duncan,* 86 S. C., 370; 68 S. E., 684, Ann, Cas., 1912-A, 1016. *State v. Way,* 76 S. C., 91; 56 S. E., 653. and *State v. Willams,* 115 S. C., 245; 105 S. E.. 343.

It would seem clear, therefore, as suggested in the opinion heretofore filed, that any plausible criticism of the instruction would have to be predicated upon the ground that it unduly stressed one of the states's contentions of fact by directing attention to a particular phase of the evidence. That is, that by thus calling attention to a particular phase of the evidence, the Judge indicated that it was entitled to peculiar weight, and thereby intimated his opinion as to its force and sufficiency. I know of no rule or precedent for the proposition that, by stating a certain fact or facts hypothetically for the purpose of declaring a principle or

proposition of law applicable to a case, the trial Judge there-
by indicates his opinion as to the weight and sufficiency
of the evidence tending to prove such facts. If that were
the 'law, it is obvious that no charge based upon
a hypothetical statement of facts which did not include all
the facts which there was evidence tending to establish,
could ever be sustained. In the absence of any warrant for
condemning the charge upon that general ground there is,
in the writer's opinion, no substantial basis for holding
that this charge was upon the facts. The charge merely
called for an application to facts hypothetically stated of the
familiar legal maxim, *"falsus in uno, falsus in omnibus."*
The rule recognized in a number of jurisdictions, in which,
as in this State, a charge upon the facts is prohibited, is thus
stated in 16 Corpus Juris, 960, § 2348:

"It is proper for the Court to suggest to the jury that,
if accused has uttered false exculpatory statements, they
may, but need not necessarily, infer his guilt therefrom."

In our case of *State v. Howard,* 32 S. C., 91, 96,
97; 10 S. E., 831, a charge which was, in substance,
to the effect that the jury could infer guilt from
defendant's "lying" about his whereabouts at the time of
the commission of a crime was held not to indicate the
Judge's "opinion of the facts," and not to be a charge upon
the facts. While that case was decided under the Con-
stitution of 1868 (Art. 4, § 26), which permitted the Judge
to state the testimony, the constitutional inhibition against
charging "with respect to matters of fact" was the same as
in our present Constitution (Article 5, § 26), and upon
the point here involved—whether a charge of this character
is tantamount to an expression of opinion as to the weight
and sufficiency of evidence—the decision in *State v. Howard*
is not without pertinent bearing. In the very recent case of
*Willcox, Ives & Co. v. Jeffcoat,* 135 S. C., 149; 133 S. E.,
463 (filed June 1, 1926), the trial Judge was held guilty of
reversible error in refusing to charge without modification

that "the failure or refusal of a party to produce evidence peculiarly within his knowledge and control, which would have an important bearing upon the facts in dispute, warrants the inference that it would be unfavorable to his contention." If the Court must so charge as to the fact of a mere failure to produce evidence, there would seem to be no good reason for condemning a charge which merely permits the jury to draw such unfavorable inference from the fact, hypothetically stated, that a party has made false statements as to matters peculiarly within his own knowledge—especially when such charge authorizes the drawing of the unfavorable inference only "in connection with the other circumstances" of the case.

For the foregoing reasons, hurriedly stated, the writer is unable to agree that there is either technical or substantial merit in the points raised by exception 9 and 14.

As to the defendant Holland Pittman, the writer deems it not improper to say that the record perhaps affords some ground for the view that the ends of justice might be attained by the infliction of a less severe punishment than the death penalty. But that is a question for the consideration of another department of government. Certainly this record furnishes no substantial basis, in the writer's opinion, for a conclusion that the judgment of the trial Court was in any wise influenced by any error of law which, in the discharge of the sole function committed to it by the Constitution, it is the duty of this Court to correct by the granting of a new trial.

MESSRS. JUSTICES WATTS and COTHRAN and MR. ACTING ASSOCIATE JUSTICE PURDY concur.

MR. CHIEF JUSTICE GARY did not participate.